# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of )
)
JULIANNA P. NOBLE, )
)
              Respondent, )
)
      and )
)
E. LEE NOBLE III, )
)
              Appellant, )
)
EDWIN NOBLE, JR., )
)
              Appellant, )
)
TALLMAN BUILDING, LLC, a )
Washington Limited Liability Company, )
)
              Defendant. )
)

NO. 71206-3-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: May 2, 2016

LAU, J. — In this consolidated dissolution and debt collection action, Lee Noble

and his father, Ed Noble, appeal the trial court's property division and other rulings.

After seven years of marriage, Julianna Noble petitioned for divorce from Lee.[1] Ed sued

---

[1] We use the parties' first names for clarity.

Lee to recover on promissory notes and sale proceeds from their real estate business. The two actions were consolidated for trial. The court awarded some property interests owned by Ed to the marital community and Julianna. It also dismissed Ed's lawsuits against Lee. The court characterized the marital estate as mostly community and awarded Julianna nearly half the marital estate. Lee and Ed appeal orders entered on the property division, attorney fees award, and Ed's collection actions. Because the court lacked authority over Ed's disputed property interests and it mischaracterized the disputed marital assets, we reverse and remand the property division for redistribution. We also reverse and remand Julianna's attorney fees award for further proceedings, and deny appellate attorney fees. We also affirm dismissal of Ed's promissory note lawsuit. We reverse and remand Ed's Tallman lawsuit for further proceedings.

## FACTS[2]

### Ed and Lee's Real Estate Business

For over 30 years Lee partnered with his father, Ed, in the acquisition, development, and lease of real properties through limited liability companies (LLCs). They both agreed on equal ownership and to share profits equally.

Lee and Ed identified property with development potential. Lee secured the required permits and designed the structures while Ed secured financing. They used the sale proceeds to reinvest in their next projects.

In 1996, Ed and Lee formed their first LLC as Investment Management Holding Company (IMHC), to do business as "Noble Homes" in Washington.[3] They continued to

---

[2] The parties are familiar with the facts. So we only discuss them briefly.
[3] The parties refer to this entity throughout this case as either Noble Homes LLC or IMHC. They are both the same entity.

form LLCs to buy and sell real properties. They signed nearly identical operating agreements as equal owners and sole members. For some of the LLCs, Lee was the sole owner and member. The LLCs used a "centralized cash management system" and a unified accounting system under the umbrella of IMHC. Report of Proceedings (RP) (Oct. 18, 2013) at 1923-24. Ed and Lee contributed variable amounts of "capital," "equipment," "services," and "experience." Exhibit (Exs.) 310, 373, 380, 388, 405.

After the marriage, Lee continued to manage, buy, sell, and develop real estate alone or with Ed. He received no specific compensation for his labor. But he took frequent draws in various amounts between $4,000 and $8,000 from the centralized account to pay personal expenses, including the mortgage on the family residence where he and Julianna lived. Lee deposited those draws into a KeyBank personal and business checking account. He deposited about $800,000 to $1 million during the marriage.

By the time he married Julianna in 2004, Lee owned real properties worth about $6.28 million. He still owned some premarriage properties that the trial court characterized as Lee's separate property:

> 4629 Gay Avenue: Lee's personal residence.
> 2127A Waverly: A townhouse formerly part of a development owned by Ed and Lee.
> Warren/Miller Apartments: Lee owned 50 percent in two apartment buildings.
> Lot 5 Commodore Way: Ed and Lee owned equally through IMHC/Noble Homes LLC
> Merit Building: Ed and Lee owned equally through Merit Building LLC.
> 9233 25th Avenue NW: Ed and Lee owned equally through IMHC/Noble Homes LLC.

CP at 306, 324.

Ed and Lee sold some premarriage properties just before Julianna filed for divorce. They used those proceeds to purchase other properties during the marriage.

Tallman Building LLC

Lee and Ed formed Tallman Building LLC in 1999 as equal owners. Tallman acquired properties both before and after Lee and Julianna married. In 2011, Tallman agreed to sell its properties for $9.5 million (later reduced to $8.75 million). Ed and Lee used some sale proceeds for various purposes. In 2013, Lee and Julianna agreed to distribute some proceeds pending the divorce. They agreed to place the $2.183 million remainder in a trust account pending the divorce proceedings.

Ed sued Tallman to enforce his right to half the Tallman sale proceeds—$3.065 million. Under Lee and Julianna's agreed order, Ed received only $1 million in sale proceeds.

Community Labor

Both Lee and Julianna are high school graduates. Before her marriage to Lee, Julianna worked for 25 years in the travel industry and earned up to $40,000 per year. After her marriage, she continued to work as a travel agent and also worked on Lee's various real estate projects. She eventually quit the travel business and devoted full time to the real estate business.

In 2007, Julianna received $3,000 per month as "contract labor." IMHC later paid her a monthly salary between $2,250 to $2,400. She received $135,750 during the marriage for her work on the real estate business.

The court concluded that the community was undercompensated by $1.1 million based on "inadequate compensation to Julianna Noble, the lack of a salary for Lee

Noble, and the lack of commission for leasing, purchase and sale transactions during the marriage." CP at 319.

### Carstens Building LLC

Ed and Lee formed Carstens Building LLC in 1998 as equal owners. In 2006, Carstens sold its properties for $1.5 million. Carstens used some sale proceeds to purchase 1515 Leary Way. In 2011, Carstens sold Leary Way for $2.5 million just before the divorce. Ed and Lee each claimed half interest in the sale proceeds. Ed received some of the proceeds and a $203,376 promissory note signed by Lee to "true up" the proceeds. The court refused to order Ed to disgorge his proceeds. Ed later sued Lee to enforce the Leary Way promissory note and other notes Lee signed over the years.

The Tallman action and promissory note action were later consolidated with the divorce proceeding.

### Other Properties

Ed and Lee formed Dayton Building LLC in 2011 as equal members. The LLC purchased the Dayton Building in November 2011. Lee formed other LLCs to acquire more properties during the marriage:

Ellis Garage LLC[4]
    7201 East Marginal Way Property
East Marginal Way Building LLC
    5000 East Marginal Way
Colorado Building LLC
    5021 Colorado Avenue South
Pullington LLC
    Apartments at 509-519 North 85th Street

---

[4] Ed withdrew his membership in this LLC before it acquired the Marginal Way property.

Lee also acquired non-LLC properties during the marriage:

3003 Perkins Lane West
3718 West Lawton
Hood Canal (19121 East State Route 106)
26958 222nd (Maple Valley)[5]

The Consolidated Trial

After a 13-day trial, the trial court disregarded all the LLCs in which Ed and Lee were members and invalidated all the LLC operating agreements based on its corporate disregard theory:

> [A]ll of the LLCs in this case, whether owned jointly by Ed and Lee Noble or solely by Lee Noble, shall be disregarded as independent entities for purposes of the cases herein due to the lack of documentation sufficient to define the LLCs and the disregard of the LLC structures in their long term course of conduct.
> 
> . . . .
> 
> [The fact that] all of the LLCs in this case shall be disregarded means that the Operating Agreement of all the LLC[s] are hereby rendered invalid for purposes of the cases herein.

CP at 311-12.

It "decide[d] on equitable grounds what, if anything, Ed Noble is due from the remaining Tallman sale proceeds or promissory notes." CP at 312.

The court also concluded that Lee acquired the Dayton Building alone and credited Ed with no interest in the property.

The court also ruled that any properties acquired by Lee and Ed after Lee married were all community property. It reasoned that the community was

---

[5] The court found that this property was acquired after Lee and Julianna began a committed intimate relationship. Lee contends the purchase price was paid before the relationship began using separate funds.

undercompensated by $1.1 million for community labor during the marriage and these unpaid funds were commingled in the pooled Noble accounts.

> [T]he undercompensation is allocable jointly and severally across the LLCs and among the non-LLC properties purchased by the community.
>
> . . . .
>
> All mortgages for all the properties were paid out of the commingled account throughout the marriage. To the extent that the properties of LLCs contain a separate interest of Lee Noble's, the court finds ownership of these properties has been converted to community property. The Leary and Tallman parcels have already been sold, and the court should equitably distribute the funds that remain.

CP at 319-20.

The trial court estimated the community estate at the time of trial as nearly $13.8 million. It awarded the property to Lee and Julianna in roughly equal shares. Lee received property valued at $6,889,840 and Julianna received property valued at $6,884,042. Julianna's share included the remaining Tallman proceeds held in trust—$2.183 million and real property she selected.

Using its "equitable" community undercompensation theory, the court declined to award any remaining Tallman proceeds to Ed. The court dismissed Ed's Tallman lawsuit and his promissory note lawsuit.

The court ordered Lee to pay Julianna attorney fees of $150,000 based on his alleged "recalcitrance . . . regarding violations of court orders and participation in collusive collateral lawsuits." CP at 302.

Lee and Ed appeal.

ANALYSIS

Standard of Review

We review the distribution of the marital estate for manifest abuse of discretion. In re Marriage of Kraft, 119 Wn.2d 438, 450, 832 P.2d 871 (1992). But we review de novo the trial court's characterization of property as community or separate. In re Marriage of Skarbek, 100 Wn. App. 444, 447, 997 P.2d 447 (2000). We review questions of law and conclusions of law de novo. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

Unchallenged findings of fact are treated as verities on appeal.[6] In re Marriage of Kim, 179 Wn. App. 232, 246, 317 P.3d 555 (2014). Appellate courts defer to the trial court on issues of conflicting evidence and witness credibility. In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).

Lee and Ed seek reversal of the trial court's property division on several legal grounds. They mainly argue trial court error in ruling on Ed's property interests, corporate disregard, and community undercompensation. They also challenge the court's attorney fees award to Julianna and dismissal of Ed's lawsuits.

Trial Court's Adjudication of Ed's Property Interests

Ed contends the trial court exceeded its limited authority in a marital dissolution action to award Julianna property in which he claims an ownership interest.[7] Ed also argues the trial court "proceeded to strip" him of his interests in the remaining Tallman

---

[6] Lee and Ed do not challenge the findings on insufficiency grounds.

[7] Lee adopts the arguments made by Ed that the trial court erred in disregarding the LLCs and divesting him of his interests by treating his assets as community property and, "in particular awarding Dayton to Julianna." Br. of Lee Noble at 44.

proceeds, the promissory notes, and his jointly owned properties. He claims the trial court ignored the contemporaneous documentary tracing evidence, and misapplied corporate disregard and undercompensation principles.

He acknowledges the consolidated lawsuits involving the promissory notes and his remaining share of the Tallman sale proceeds were properly before the court. But Ed's appearance was limited to the two civil lawsuits which the court consolidated with the dissolution action.

At trial, Ed was half owner with Lee in these LLCs and properties:

> Noble Homes/IMHC LLC (formed 1996)
> > Lot 5 Commodore Way (acquired in 1997), valued at $320,000.
> > 9233 25th Avenue NW (acquired in 2002), valued at $125,000.
> Merit Building LLC (formed 1998)
> > 951 Market Street (acquired in 1998), valued at $400,000.
> Tallman Building LLC (formed 1999)
> > Properties sold for $8.75 million.
> > $2.183 million proceeds held in trust.
> Carstens Building LLC (formed 1998)
> > Leary Way property sold for $2.5 million.
> > Promissory note of $203,376 outstanding.
> Dayton Building LLC (formed 2011)
> > 8420 Dayton Avenue North (acquired in 2011), valued at $984,500.

A trial court's jurisdiction over dissolution actions is statutory. In re Marriage of McKean, 110 Wn. App. 191, 194, 38 P.3d 1053 (2002).

> In spite of an often-repeated and accurate assertion that the superior court is a constitutional court of general jurisdiction, [in family law court matters], as in several other areas, the exercise of the court's jurisdiction has been held to be restricted by legislative enactment. Thus, it has been held that the court has no power to compel a liquidation of assets for the benefit of creditors as an incident to a divorce decree, since the divorce act makes no provision for such an exercise of jurisdiction. This would not seem properly treated as a question of subject-matter jurisdiction. Rather, the inquiry should be whether all appropriate parties are before the court.

14 KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 3:7 (2d ed. 2009) (footnotes omitted).

In In re Marriage of Soriano, 44 Wn. App. 420, 722 P.2d 132 (1986), Seattle First National Bank challenged the court's jurisdiction to determine its interest in a marital dissolution action. We reaffirmed the well-settled rule that the trial court lacks jurisdiction in a dissolution action to determine the rights of a third party in marital property.

> We abide by the longstanding rule that in a dissolution proceeding the superior court has jurisdiction only over the parties to the action. It may not adjudicate the rights of third parties who have an interest in any of the property at issue.

Soriano, 44 Wn. App. at 420.

We explained this rationale based on Arneson v. Arneson, 38 Wn.2d 99, 227 P.2d 1016 (1951), the seminal case on jurisdictional limits of courts sitting in marital dissolution proceedings:

> Arneson [ ] [held] that the jurisdiction and authority of courts sitting in statutory proceedings is defined by the governing act. The court has only those powers which may be inferred from a broad interpretation of the legislation governing the proceeding. The only proper parties in a dissolution proceeding are the spouses.
> . . . .
> Thus, the court has practically unlimited power over the property in a dissolution proceeding but only as between the parties. The dissolution court has no power over the property as to the rights of third parties claiming an interest in the property.

Soriano, 44 Wn. App. at 421-22.

In addition to its jurisdictional challenge, the Bank also challenged the trial court's order requiring it to turn over the husband's stocks to the wife's trustee.[8] The Bank claimed a prior perfected security interest in the shares. In a show cause hearing, the

---

[8] In the property division, the trial court granted the wife a lien against the husband's separate and principal asset—shares of stock.

trial court determined the rights of the Bank in the securities. We vacated the trial court's order and dismissed the Bank from any further proceedings in the dissolution action.

In McKean, Division Two of this court held that the trial court lacked in personam jurisdiction to order the trust property transferred to a corporate trustee. Nonparty trustees held legal title to the property. In dividing the couple's property, the court identified "trust assets owned for the benefit of the [children]." McKean, 110 Wn. App. at 194. To protect these assets from the couples' manipulation of this property, the court ordered transfer of these assets to a corporate trustee. Citing the holdings in Soriano and Arneson, Division Two vacated the transfer order, explaining that the trial court lacked "authority to adjudicate the rights of parties not before the court, even if they have an interest in the property at issue." McKean, 110 Wn. App. at 195.

Julianna argues, "RCW 26.09.080 requires a dissolution court to ascertain the extent of any claimed third-party interests. Here the trial court exercised both its family law and general jurisdiction to resolve, in a single consolidated trial proceeding, all of the issues presented by Ed's lawsuits as well as the Lee-Julianna dissolution." Br. of Resp't at 44.

We are not persuaded by these assertions. First, as noted above, nothing in RCW 26.09.080's plain language authorizes the trial court to adjudicate the property interest of a third party such as Ed. In Soriano, we flatly rejected Julianna's statutory argument, stating, "[w]e find nothing in [chapter] 26.09 RCW, no matter how broadly construed, which gives a trial court the power to determine the rights of the Bank . . ." Soriano, 44 Wn. App. at 422.

-11-

Second, Julianna's family law general jurisdiction argument confuses subject matter jurisdiction and in personam jurisdiction. There is no dispute that Ed was never made a party to the dissolution proceeding in order to resolve any interest in the property he owned equally with Lee. Like the nonparty trustees in McKean, Ed was not a party to the dissolution proceeding.[9] In re Marriage of Lutz, 74 Wn. App. 356, 873, P.2d 566 (1994) (sister of husband joined as a party in marital dissolution proceeding to determine and quiet title to disputed property). As Ed acknowledges, the court's consolidation of his two lawsuits with the dissolution action meant the limited issues over his remaining share of Tallman proceeds and validity of the promissory notes were properly before the trial court for resolution.[10]

Julianna also argues that Ed's interests were not adjudicated because the court found "he possessed no interest." This argument is nonsensical and unsupported by the record. For example, Ed and Lee each owned half interests in Commodore Way, Merit Building, and 9233 25th Avenue West. The trial court acknowledged Ed's interest in these properties when it awarded Lee a half interest in these properties. Ed also owned half interest in the Tallman, Carstens, and Dayton LLCs. The court ruled Ed

---

[9] The findings of fact and conclusions of law at issue here show three individual cause numbers in the caption. Two cause numbers relate to the consolidation of Ed's two lawsuits (18-2-05778-6 and 13-2-17219-4). The caption also names Ed as the plaintiff in his consolidated cases and Julianna and Lee as the only two named parties in their dissolution action (11-3-08086-6). In other words, Ed is not a party for purposes of the dissolution action. The record shows no one sought to join Ed as a party in the dissolution action. Indeed, the trial court's July 31, 2013 order granted Julianna's motion to intervene and join as a party in Ed's lawsuits. But there was no corresponding motion brought to join Ed in the dissolution action. We need not resolve the question of whether an attempt to join Ed as a necessary party in the dissolution action violates Soriano.

[10] Despite intervening in Ed's lawsuit, Julianna filed no answer or sought relief against Ed.

owned no interest in these properties based on a corporate disregard theory discussed below. As to Ed's interest in the Dayton property, the court outright awarded it to Julianna.

Nor is Julianna's assertions about Ed's participation in the trial as a witness persuasive. Julianna cites no controlling authority that Ed's limited participation at trial to prosecute his two lawsuits and his trial testimony subjects him to the superior court's limited statutory jurisdiction in the dissolution proceeding.

Julianna relies on Hackler v. Hackler, 37 Wn. App. 791, 683 P.2d 241 (1984). At the dissolution trial, the husband's father testified about ownership of the couple's home, but failed to disclose a quitclaim deed executed by the couple years earlier. The court awarded the property to the wife. Two years later, the father recorded the quitclaim deed and filed suit to quiet title. The court held he was collaterally estopped from asserting ownership, "[o]ne who was a witness in an action, fully acquainted with its character and object and interested in its result, is estopped by the judgment as fully as if he had been a party." Hackler, 37 Wn. App. at 795. Hackler is inapposite. The present case implicates no collateral estoppel principle.

Julianna relies on In re Marriage of Wallace, 111 Wn. App. 697, 45 P.3d 1131 (2002). The husband quitclaimed his interest in real property to his father during the dissolution action. Division Two of this court affirmed the property award to the wife. It noted the trial court's acknowledged lack of authority to set aside the conveyance and the trial court's comment indicating the wife's recourse was a separate action for fraudulent conveyance to realize on her award.

Unlike in <u>Wallace</u>, the trial court here determined Ed's interest in properties he owned jointly with Lee, including the award of Dayton to Julianna. To give effect to its property ruling, the trial court ordered the parties to "execute any and all documents necessary to effectuate this decree." CP at 115-16. The court further ordered that Julianna receive "all right, title, and interest in and to the real properties awarded" to her using quitclaim deeds. CP at 115-16. These orders leave no doubt the trial court improperly adjudicated Ed's property interests. The trial court lacked authority over Ed's property rights in the dissolution proceedings. It was arguably authorized to resolve questions involving the validity of the promissory notes and the amount of remaining Tallman sale proceeds owed to Ed via the consolidated lawsuits. But the trial court erred when it exceeded its limited authority by ruling on Ed's shared property rights.

<u>Corporate Disregard</u>

The trial court compounded its third party adjudication error by relying on an untenable legal theory—corporate disregard—to sweep aside all the LLCs whether owned jointly by Ed and Lee or solely by Lee. The trial court found "that all of the LLCs . . . shall be disregarded as independent entities . . . due to a lack of documentation sufficient to define the LLCs and the disregard of LLC structures in their long term course of conduct." CP at 311. The trial court also found that such a finding "means that the operating agreements of all the LLCs are hereby rendered invalid for the purposes . . ." of this case. CP at 312. As discussed above, the trial court lacked authority to rule on Ed's property rights. Once it rendered the agreements inoperative, the trial court "decid[ed] on equitable grounds what, if anything, Ed Noble is due from

the remaining Tallman sale proceeds or promissory notes."[11] CP at 312. As to the Dayton property, the trial court ruled that Lee acquired this property alone. This ruling left Ed with no property interest in Dayton. The trial court lacked authority to divest Ed of his property interests under the doctrine of corporate disregard. Soriano, 44 Wn. App. 420.

Ed and Lee also argue that Julianna shows no exceptional grounds to justify the court's disregard of the LLCs to reach Ed and Lee's interest in properties established before and after the parties married.

The court entered the following findings to support its corporate disregard ruling:

> The lack of documentation to show what, if any, contributions Ed Noble made to any of the LLC's; the failure to maintain capital accounts or balance sheets for those LLC's; the gross disparity in overall equity between Ed and Lee Noble in the unified account; Ed Noble's admitted lack of involvement in labor, management and finance; the commingling of all LLC and non-LLC accounts, whether jointly owned or not; and Lee and Ed Noble's demonstrated practice of misrepresenting ownership of assets to the banks, to the IRS, and to the court, create a serious question concerning the legitimacy of the LLC's and Ed Noble's interest in them.

> The court finds that all of the LLC's in this case, whether owned jointly by Ed and Lee Noble or solely by Lee Noble, shall be disregarded as independent entities for purposes of the cases herein due to the lack of documentation sufficient to define the LLCs and the disregard of the LLC structures in their long term course of conduct.

> Lee Noble treated the LLC's as his alter ego. He commingled his private finances with those of the LLC's and the LLC's with each other, whether owned individually or in purported partnership with his father. He failed to follow LLC formalities as required by the operating agreements and the Washington State Limited Liability Company Act. He failed to keep a written record of members' capital accounts and he distributed funds to his father without regard to capital accounts and without regard to creditor

---

[11] Ed argues, "By disregarding the LLCs, the dissolution court in effect eliminated Ed's interest in the properties they held, wrongly depriving Ed of his right to enforce the operating agreements, executed years before Lee's marriage to Julianna, under which he could pursue his share of the properties and proceeds." Br. of Ed Noble at 33-34.

claims of the marital community against the LLC's for labor and equity contributions. The LLC's were inadequately capitalized due to the complete lack of capital accounting, leaving potential creditors unprotected. Assets and liabilities of the LLC's were commingled with each other and with private assets and liabilities to the point it is impossible to sort out how much money was transferred from one LLC to support the expenses of another LLC. Mortgage loans were cross-collateralized with no records kept of loans between LLC's. Mortgage interest deductions were reported in the tax returns of various LLC's regardless of which LLC asset actually secured the property (Exhibit 1006). Personal expenditures were made from LLC funds; for example, Ed Noble's 2012 remodeling costs at his new home were expensed against Pullington, LLC—an entity solely owned by Lee Noble. Lee's bookkeeper, Sandra Maluy, testified this was done for the sake of convenience.

The court finds Lee Noble took advantage of the commingled accounting and lack of balance sheets to make unsupported representations regarding Tallman Building, LLC and Cartsens Building, LLC distributions.

Lee Noble, as the managing member of Tallman Building, LLC, failed to put up defenses to Ed Noble's lawsuit against the LLC, even though his father's complaint relied on an oral agreement between the two of them that was prohibited by the LLC's operating agreement. There were defenses available to Ed Noble's lawsuit based on the Tallman Building LLC Operating Agreement and the Washington LLC Act that Lee Noble ignores. The Operating Agreement states that it is the sole source of agreement between the members and it can only be amended by a written instrument. The Operating Agreement allows distributions to members "from excess" funds and in accordance with capital account balances. The LLC is not yet winding up and creditors (the marital community) have not yet been paid, so Ed Noble has no standing to sue the LLC.

The evidence at trial has established that there is a lack of foundation for recognizing the LLC's, especially since Ed and Lee Noble failed to honor their own operating Agreements or abide by Washington's LLC Act.

The court's finding that all of the LLC's in this case shall be disregarded means that the Operating Agreements of all the LLC's are hereby rendered invalid for the purposes of the cases herein. With regard to Ed and Lee Noble's partnership, the court is required to decide on equitable grounds what, if anything, Ed Noble is due from the remaining Tallman sale proceeds or promissory notes.

CP at 311-12.

Julianna bears the burden of establishing that the corporate form was used to violate or evade a duty and that the corporate veil must be disregarded in order to prevent loss to an innocent party. Chadwick Farms Owners Ass'n v. FHC LLC, 166 Wn.2d 178, 200, 207 P.3d 1251 (2009).

"In general, a corporation is considered a separate entity, even if it is owned by a single shareholder." Dickens v. Alliance Analytical Labs., LLC, 127 Wn. App. 433, 440, 111 P.3d 889 (2005). Notwithstanding this, the equitable remedy of "corporate disregard," though "not a freestanding claim for relief," may allow a court to reach the principals of a corporation and hold them personally responsible for abuses of the corporate privilege. Landstar Inway, Inc. v. Samrow, 181 Wn. App. 109, 125, 325 P.3d 327 (2014) (citing Truckweld Equip. Co. v. Olson, 26 Wn. App. 638, 643, 618 P.2d 1017 (1980)). It is well established that the purpose of the corporate form is to limit shareholder liability. Meisel v. M & N Modern Hydraulic Press Co., 97 Wn.2d 403, 411, 645 P.2d 689 (1982).

Only in exceptional circumstances will the corporate entity be disregarded when its recognition would aid in perpetrating a fraud or result in a manifest injustice. Truckweld, 26 Wn. App. at 644.

"Under RCW 25.15.060 a member may also be liable under the theory of piercing the veil of a limited liability company if respecting the limited liability company form would work injustice, in the same way that an individual may be personally liable under the theory of piercing the corporate veil." Chadwick Farms, 166 Wn.2d at 200.

"First, the corporate form must be intentionally used to violate or evade a duty." Meisel, 97 Wn.2d at 410. "Second, the fact finder must establish that disregarding the

corporate veil is necessary and required to prevent an unjustified loss to the injured party." Dickens, 127 Wn. App. at 441.

As to the first factor, "the court must find an abuse of the corporate form." Meisel, 97 Wn.2d at 410. Courts most commonly find an abuse where there has been fraud, misrepresentation, or some kind of manipulation of the corporation to the stockholder's benefit and the creditor's detriment. Meisel, 97 Wn.2d at 410. But this showing is not enough. "[T]he law requires a showing of both disregard of the corporate form and that the disregard was done to avoid a duty owed to another." Rogerson Hiller Corp. v. Port of Port Angeles, 96 Wn. App. 918, 926, 982 P.2d 131 (1999). "If duty were to arise from abuse of the corporate form alone, the second part of the first [factor], 'to avoid a duty owed,' would be redundant." Rogerson Hiller, 96 Wn. App. at 926. If that were the case, then duty would always arise by abuses of the corporate form, "such as commingling of the corporate interests." Rogerson Hiller, 96 Wn. App. at 926. Corporate misconduct will not itself justify a disregard of the corporate entity. Morgan v. Burks, 93 Wn.2d 580, 587, 611 P.2d 751 (1980); Truckweld, 26 Wn. App. at 644-45.

As to the second factor, the "wrongful corporate activities must actually harm the party seeking relief so that disregard is necessary." Meisel, 97 Wn.2d at 410. The harm cannot be accidental. "Intentional misconduct must be the cause of the harm that is avoided by disregard." Meisel, 97 Wn.2d at 410. This is a proximate cause requirement. Morgan, 93 Wn.2d at 587. But "[t]he absence of an adequate remedy alone does not establish corporate misconduct." Meisel, 97 Wn.2d at 411. If this were so, the purpose of the corporate form—"to limit liability"—would be defeated. Meisel, 97

Wn.2d at 411. "Separate corporate entities should not be disregarded solely because one cannot meet its obligations." Meisel, 97 Wn.2d at 411.

Washington recognizes the "alter ego" theory of corporate disregard. Under this theory, a court may disregard the corporate form "when 'the corporate entity has been disregarded by the principals themselves so that there is such a unity of ownership and interest that the separateness of the corporation has ceased to exist.'" Columbia Asset Recovery Group, LLC v. Kelly, 177 Wn. App. 475, 486, 312 P.3d 687 (2013). "[T]here must be such a commingling of property rights or interests as to render it apparent that they are intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others." Norhawk Invs., Inc. v. Subway Sandwich Shops, Inc., 61 Wn. App. 395, 401, 811 P.2d 221 (1991) (alteration in original). The Supreme Court has also considered whether "corporate records or formalities" were kept and whether there was any suggestion of "an overt intention by [the private person] to disregard the corporate entity." Grayson v. Nordic Constr. Co. Inc., 92 Wn.2d 548, 553, 599 P.2d 1271 (1979). Nevertheless, "informality in the operation of a closely held corporation [will not] lead to a disregard of the corporate entity if the informality neither prejudices nor misleads the plaintiff." Roderick Timber Co. v. Willapa Harbor Cedar Prods., Inc., 29 Wn. App. 311, 315, 627 P.2d 1352 (1981).

This court reviews the facts underlying the corporate disregard for substantial evidence. Rogerson Hiller Corp., 96 Wn. App. at 924. But we review de novo the legal conclusions drawn to support corporate disregard. Rogerson Hiller Corp., 96 Wn. App. at 924.

> Dominion and control of the corporation by the sole or principal
> shareholder, who is entitled to all of the corporation's profits, does not

> alone make the shareholder personally liable. Since alter ego corporations are not of themselves illegal, the fact that an individual is the alter ego of a corporation is insufficient to state a claim against an individual.

1 WILLIAM MEADE FLETCHER & CAROL A. JONES, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 41.10, at 142-43 (2006) (footnotes omitted).

Ed and Lee contend the trial court disregarded the LLCs based on alleged failure to observe corporate formalities and lax accounting practices contrary to the LLC operating agreements and the Washington State Limited Liability Act, Chapter 25.15 RCW.[12]

Ed argues no "duty" existed to maintain capital accounts or balance sheets. Br. of Ed Noble at 36. He points to the operating agreements which all contain a similar provision that excuses the LLCs from any obligation to adhere to "formalities or requirements": "No member shall be liable for company liabilities. The failure of the company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this agreement shall not be grounds for imposing personal liability on the members or manager for company liabilities." See, e.g., Ex. 310. The parties' experts also agreed it is not unusual for family-owned companies to observe fewer formalities in corporate record keeping, including use of a "centralized cash management system." RP (Oct. 18, 2013) at 1923-24.

Nothing in this record shows that lax accounting practices and informality in the operation of this father-son business either prejudiced or misled Julianna. Roderick

---

[12] The LLC Act was substantially amended in January 2016 after all the LLCs in this case were formed.

Timber Co., 29 Wn. App. at 315. The lack of a critical finding on this issue underscores this point. The record undisputedly shows these informal business practices existed for years before Julianna married Ed. And many of the LLC operating agreements predate the marriage. Julianna never presented evidence and the court never found that LLC lax accounting practices and operating informalities prejudiced, misled, or actually harmed her. The absence of evidence and related finding on this essential element renders the court's corporate disregard ruling erroneous. Nor did Julianna demonstrate and the court never found that Ed and Lee intentionally abused the corporate form through lax accounting practices and operating informalities for the purpose to harm Julianna.

The record undisputedly shows that the various abuses of the LLC form alleged by Julianna were going on long before the marriage. For instance, the record shows lax record keeping and informal accounting practices going back to the mid 1990's when the first LLC was formed. The LLCs never maintained regular capital accounts or individual balance sheets. We fail to see how Julianna's position in the divorce would be different if the LLC operation meticulously documented its transactions. Truckweld, 26 Wn. App. at 644-45 ("The informality with which Aztec may have been operated neither prejudiced nor misled Truckweld . . . we cannot see how Truckweld's position would be different had Aztec meticulously documented its corporate actions. . . . Similarly, Truckweld's allegation that Aztec was inadequately capitalized fails to convince us that Olson abused the corporate entity.").

Other alleged misdeeds relied on by the trial court also predate the marriage. For instance, the court found that Lee and Ed misrepresented their interest in various

properties three times beginning in 1997. The court found Lee and Ed collaborated to misrepresent Lee's ownership interest in financial statements submitted in 2003 to Shoreline Bank. The court found the pair made "significant" changes to their financial statements in 2004. Events that predated or occurred near the marriage date do not establish that alleged misdeeds by Ed and Lee were done with intent and actually caused harm to Julianna.

Julianna does not dispute that corporate disregard is an exceptional remedy. It applies infrequently when the principles of fraudulent conveyance law could not apply. See Robert Charles Clark, The Duties of the Corporate Debtor to Its Creditors, 90 HARV. L. REV. 505 (1977). Wrongful corporate activities must actually harm the party who seeks relief and intentional misconduct must be the cause of the harm. Meisel, 97 Wn.2d at 410. These essential factors to disregard the LLC forms are absent here. Julianna's corporate disregard claim fails as a matter of law.

Even if disregard was proper, Julianna points to no authority supporting the court's ruling invalidating all of the LLC operating agreements (including agreements predating the marriage) under its corporate disregard theory. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

The court also disregarded the LLC forms where no "exceptional circumstances" existed to justify disregard. Nothing about this case was exceptional for purposes of the corporate disregard doctrine. It is well settled that all property and liabilities whether separate or community are properly before the dissolution court. Except for Ed's alleged property interests noted above, Lee's separate property was properly before the court and subject to the trial court's broad discretion to make a fair and equitable

property distribution. "Under appropriate circumstances [the trial court] need not award separate property to its owner." In re Marriage of Larson and Calhoun, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013).

The trial court's broad discretion, in general, to make a fair and equitable property division permitted it to make a just property award without invoking the extraordinary remedy of corporate disregard reserved only for exceptional cases of misconduct. The court erred when it used the exceptional remedy of corporate disregard to reach LLC-owned properties and invalidated the operating agreements here.

A trial court abuses its discretion if its property division is manifestly unreasonable or based on untenable grounds or untenable reasons. A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard. Larson, 178 Wn. App. at 138.

The trial court manifestly abused its discretion here when it disregarded the LLC forms and invalidated the operating agreements.[13]

Marital Community Undercompensation

---

[13] The trial court disregarded the LLC operating agreements and concluded that Ed had no interest in the LLC-owned properties. But it recognized Lee had only a 50 percent interest in Commodore Way and 951 Market Street. This apparent recognition of Ed's interests is difficult to reconcile with the court's legal rulings.

Lee owned real properties, alone or with Ed, prior to Lee's marriage in 2004. Ed and Lee contend they sold some of these properties during the marriage and used the proceeds to purchase other properties. They argue the trial court erred when it eliminated Ed's half-interest in the Tallman proceeds based on a community undercompensation theory. The trial court ruled that Ed was owed "nothing more" from the Tallman proceeds on "equitable" grounds, because:

> [H]e has not compensated the marital community for the unknown amount of capital it has contributed to sustain the properties in which Ed held an interest and he has not compensated the community for the years' worth of labor spent working on the properties.

CP at 314.

> Lee argues the trial court wrongly concluded:

> The basis for the trial court's decision that every asset acquired by Lee (and his father Ed) during the marriage was community property was its determination that "not less than $1.1 million of undercompensated community funds were retained and commingled in the pooled business accounts [and] Lee Noble's Key Bank account."

CP at 319.

Ed and Lee also argue the trial court ignored substantial evidence tracing the funds used to purchase the properties to premarital assets owned by Ed and Lee.[14]

---

[14] Julianna criticizes Lee's observation that the trial court signed Julianna's proposed 25-page findings and conclusions "without comment or change." Br. of Lee Noble at 45. The trial court gave no oral ruling after this complex 13-day bench trial over a marital estate roughly valued at $13 million. No trial court oral ruling and no trial court edits to the proposed findings and conclusions, in this context, is unusual. We made a similar comment in Berryman v. Metcalf, 177 Wn. App. 644, 657, 312 P.3d 745 (2013), "[t]he trial court signed Berryman's proposed findings of fact and conclusions of law without making any changes except to fill in the blank for the multiplier of 2.0."

We also note that Lee and Julianna each proposed findings and conclusions without the benefit and guidance of an oral ruling from the trial judge. In other words, the parties each submitted findings and conclusions without any knowledge of how the trial court intended to resolve the property division and other issues.

They explain that clear and convincing tracing evidence shows the disputed postmarital properties were all acquired with Ed and Lee's premarital separate properties. The disputed properties are thus presumed separate property. "Undercompensation of the community could not change the character of separate property." Lee's Reply at 2.

The trial court here ruled that these assets traced to separate property were community because the community was undercompensated in the amount of $1.1 million for uncompensated labor performed by Lee and Julianna "on the real estate business." CP at 318. It also ruled that "[a]ll of the uncompensated benefit of the community labor was retained by the LLCs and by Lee Noble in his business/personal KeyBank account." CP at 319. By retaining the value of the community labor in the accounts, which funded the different mortgage payments, the separate properties were all converted to community property:

> All mortgages for all the properties were paid out of the commingled account throughout the marriage. To the extent that the properties or LLCs contain a separate interest of Lee Noble's the court finds ownership of these properties has been converted to community property.

CP at 319-20.

In a dissolution proceeding, before dividing the property the trial court must consider all relevant factors, including but not limited to:

> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage or domestic partnership; and
> (4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

RCW 26.09.080.

The court must have in mind the correct character and status of the property before any theory of division is ordered. Brewer v. Brewer, 137 Wn.2d 756, 766, 976 P.2d 102 (1999). Distribution of property by the trial court should be disturbed only if there is a manifest abuse of discretion. Brewer, 137 Wn.2d at 769. But the characterization of property as community or separate property is a mixed question of law and fact. In re Marriage of Skarbek, 100 Wn. App. 444, 447, 997 P.2d 447 (2000). "The time of acquisition, the method of acquisition, and the intent of the donor, for example, are questions for the trier of fact." In re Marriage of Kile, 186 Wn. App. 864, 876, 347 P.3d 894 (2015). The ultimate characterization of property as community or separate is a question of law that this court reviews de novo. Kile, 186 Wn. App. at 876.

The character of property as separate or community property is determined at its acquisition date. In re Estate of Borghi, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). "Separate property will remain separate property through changes and transitions, if the separate property remains traceable and identifiable. . ." In re Marriage of Chumbley, 150 Wn.2d 1, 5, 74 P.3d 129 (2003).

An asset is separate property if acquired before marriage, during marriage by gift or inheritance, or during marriage by the traceable proceeds of separate property. RCW 26.16.010; In re Marriage of White, 105 Wn. App. 545, 550, 20 P.3d 481 (2001). Property acquired during marriage is generally presumed to be community property, and the party asserting otherwise has the burden of proving it was acquired using separate funds by clear and convincing evidence. RCW 26.16.030; Skarbek, 100 Wn. App. at 451. This requires the proponent of the separate property to trace the funds

used to acquire the property with some degree of particularity. Berol v. Berol, 37 Wn.2d 380, 381-82, 223 P.2d 1055 (1950).

"Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." Borghi, 167 Wn.2d at 484. One way of establishing this is where "the property becomes so commingled that it is impossible to distinguish or apportion it, then the entire amount becomes community property." Chumbley, 150 Wn.2d at 5-6. If the party succeeds in doing this, all the funds or property into which the funds were invested belong to the community. In re Bing's Estate, 5 Wn.2d 446, 456-57, 105 P.2d 689 (1940).

"[L]abor performed during a marital or quasi-marital relationship has a community character from its inception. In our community property system, there is no basis for allocating one party's labor to a separate property account." Lindemann v. Lindemann, 92 Wn. App. 64, 73, 960 P.2d 966 (1998).

The record shows the trial court never addressed the substantial tracing evidence presented at trial.[15] The trial court entered a few general credibility findings. But it entered no findings (and made no oral ruling) to resolve the tracing issue. The trial court, instead, characterized these disputed postmarital assets as community property based on alleged community undercompensation. This issue raises no question about the sufficiency of the findings on tracing. We review the trial court's property characterization de novo as a question of law. "[T]he 'finding' that the funds

---

[15] The record shows almost 9 out of 13 trial days on tracing-related evidence and voluminous tracing exhibits used or admitted.

-27-

were community property is not a finding of fact, it is a conclusion of law." Skarbek, 100 Wn. App. at 447.

Under CR 52 the court must enter findings on the ultimate facts and relevant issues.[16] Proper characterization of real property here as separate or community via tracing is a critical and material issue ignored by the trial court.

The record also shows most of the tracing evidence was not disputed at trial. For example, Julianna's CPA expert witness agreed that Lee's CPA expert witness, "correctly followed the cash to the acquisition of every parcel of real estate during the marriage, with your two exceptions . . ." RP (Oct. 7, 2013) at 812-15.

> [SKONE]: If you immediately turn to page eight, [Lee's expert report] starts with the tracing of the Tallman funds and goes on to trace all the other acquisitions during marriage, correct?
> [BEATON]: Yes, it does.
> [SKONE]: Okay. And you told me before that you had two disagreements with all of his tracing, all the transactions regarding where the money came from to buy all these properties, and they were two in number, right?
> [BEATON]: I did.
> [SKONE]: So that you agree that [Hawes] correctly followed the cash to the acquisition of every parcel of real estate during the marriage, with your two exceptions, correct?
> [BEATON]: I did.
> [SKONE]: And one exception was that he said that a loan in part secured by Tallman of $900,000 from then Frontier Bank that he said all went into Colorado. You said no, only $761,000 or so was all you were willing to give credit for the acquisition of Colorado, correct?
> [BEATON]: I did.
> [SKONE]: Okay. And then the other difference that you pointed out was not a tracing of funds, but an allocation of funds. And that was the $140,000 that went in part to purchase the Dayton property, right?
> [BEATON]: Well, you've characterized it as an allocation versus a tracing, but you can't get an allocation unless you trace it, so I'm not sure I agree with that.

---

[16] CR 52(a)(1) states that, "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law."

-28-

[SKONE]: You don't doubt that the $140,000 was used, in part, to acquire Dayton?

[BEATON]: Oh, all of it was.

[SKONE]: All of it was?

[BEATON]: Absolutely.

[SKONE]: What you disagreed with was not that the $140,000 entirely was used as part of the Dayton acquisition?

[BEATON]: That's correct.

[SKONE]: But rather, you disagreed with his allocation of equal ownership of Dayton to Ed Noble and Lee Noble?

[BEATON]: Actually, I think it's the other way around. I think Mr. Hawes allocated it all, unless it's the other way around. Maybe it was the other way around. Yes. Mr. Hawes believes that it was a 50/50 purchase. The documents I reviewed indicated that it was not. That is was [sic] 100 percent purchased by Lee Noble.

[SKONE]: So your position is that all of Dayton is owned by Lee Noble, inconsistent with Mr. Hawes' presentation that half is owned by Ed Noble and half is owned by Lee Noble?

[BEATON]: I'll agree with that.

[SKONE]: And with those two simple differences, every single one of Mr. Hawes' tracing of cash, loan proceeds, 1031 exchanges, for the acquisition of the real estate during the marriage is accurate?

[BEATON]: I would agree that wherever Mr. Hawes utilized documentation that he was accurate in the utilization of that documentation. Yes.

. . . .

[SKONE]: Okay. Now, let's talk apples and apples. Mr. Hawes' [Lee's expert] report, and I'm sure you will agree with me, purports to be a tracing of the source of funds for the acquisition of the real estate, which was acquired during the marriage by Lee Noble, correct?

[BEATON]: Yes. In part. In part.

[SKONE]: I'm asking you if that's a correct statement?

[BEATON]: It's not.

[SKONE]: What is wrong with my statement?

[BEATON]: Because you have a whole section on Tallman proceeds that are being allocated that are not the tracing of the acquisition of the properties.

[SKONE]: With that exception, is it right?

[BEATON]: Yes, with that exception.

[SKONE]: Okay. All right. So without his—if you took out how he allocates the Tallman proceeds in that report, his report is limited to tracing the assets that were used to acquire the real estate during the marriage by Lee Noble?

[BEATON]: That's correct.

[SKONE]: And it's accurate?

[BEATON]: According to the documentation provided, yes.

[SKONE]: Are you aware of any documentation that is inconsistent with Mr. Hawes' report as to the simple question of where did the funds come from to acquire the real estate by Lee Noble during the marriage? Other than the two exceptions you noted, the $140,000 to Dayton and the approximately same amount to Colorado?
[BEATON]: No. The only one I was questioning would have been the Dayton, but all he puts down is $140,000. He doesn't say where it came from. But yes, I would agree then that the cash and assets used to acquire were traced from certain accounts to the acquisition of real properties accurately.

RP (Oct. 7, 2013) at 812-15. Julianna's own expert acknowledged, and the record confirms, that the documentary evidence standing alone supported Lee's tracing.

"Generally, where findings are required, they must be sufficiently specific to permit meaningful review." In re LaBelle, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). "The purpose of the requirement of findings and conclusions is to insure the trial judge '"has dealt fully and properly with all the issues in the case before [she] decides it and so that the parties involved and this court on appeal may be fully informed as to the bases of [her] decision when it is made.'" LaBelle, 107 Wn.2d at 218-19. Even if the credibility findings were meant to address the tracing testimony here, they fail to show the trial court "dealt fully and properly" with the tracing issue.

Our review of issues on the disputed real properties acquired postmarriage and the Tallman and Leary Way sale proceeds are hampered by the trial court's failure to analyze and resolve the tracing issue here. The trial court on remand must resolve the tracing issue and enter specific findings of fact and conclusions of law to support its tracing decision.

The court also treated all assets acquired by Ed and Lee during Lee's marriage as community property based on alleged unpaid community funds commingled in the real estate business and Lee's personal accounts. The court ruled "[t]o the extent that

the properties of LLCs contain a separate interest," that interest was transmuted to community property based on a community undercompensation theory. CP at 319-20.

Julianna avoids the tracing evidence. She claims instead that all the disputed properties were improved with community labor during the marriage. But that does not change their character from separate to community. "Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." Borghi, 167 Wn.2d at 484. No evidence shows that Lee intended to change his separate property's character or that Ed intended to give up his property interests.

Julianna may be entitled to reimbursement protected by an equitable lien for any unpaid labor contributed to the improvement or management of these properties. But the unpaid labor cannot alter the properties' character.

> Later community property contributions to the payment of obligations, improvements upon the [separate] property, or any subsequent mortgage of the property may in some instances give rise to a community right of reimbursement protected by an equitable lien, but such later actions do not result in a transmutation of the property from separate to community property.

Borghi, 167 Wn.2d at 491 n.7.

Julianna relies on Hamlin v. Merlino, 44 Wn.2d 851, 272 P.2d 125 (1954), to argue "where separate property business assets are combined with community personal services rendered without adequate compensation, all the income and increase in value of the business is presumed community property." Br. of Resp't at 59. Julianna never proved that the $1.1 million contribution of community labor increased the properties' value. "[A]ny increase in the value of separate property is

-31-

presumed to be separate property. This presumption may be rebutted by direct and positive evidence that the increase is attributable to community funds or labor." Elam v. Elam, 97 Wn.2d 811, 816-17, 650 P.2d 213 (1982).

Nor is it sufficient to show that Lee's properties increased in value during the marriage. Julianna failed to prove with "direct and positive evidence" that the increase in value was due solely to the community and not "the natural course of inflation." Elam, 87 Wn.2d at 815. The trial court here erred where it assumed unpaid community labor alone increased the disputed properties' value during the marriage.

Julianna also argues the value of unpaid community labor was "indiscriminately commingled" with Lee's separate property, thus making it all community property. Br. of Resp't at 60-61. She cites Koher v. Morgan, 93 Wn. App. 398, 968 P.2d 920 (1998). Koher owned two companies when he met Morgan. He paid himself an artificially low salary during their relationship. The trial court found that by not paying himself a regular salary, Koher had commingled "community-like" property with the separate profit of his business by "intermix[ing] large sums of separate and relationship income in his personal and business accounts" from which he acquired property and equipment and funded other investments. Koher, 93 Wn. App. at 402-03. Because Koher was "unable to trace any portion of the disputed assets to his separate profits," it was "more appropriate and fair to find that the assets Koher had acquired [during the relationship] were subject to distribution" as community-like property. Koher, 93 Wn. App. at 403.

Unlike in Koher, even if unpaid community labor was commingled with LLC profits, Lee contends he traced the disputed assets acquired during marriage to his

-32-

separate property by clear and convincing proof.[17] The trial court must resolve this significant issue and enter proper findings and conclusions to aid our review.

## Award of Distributed Property

Lee contends the trial court erred when it awarded Tallman and Leary Way sale proceeds that were already distributed to Ed as part of Lee's community property share.[18] He thus received nearly $2 million less in community assets than Julianna. Ed contends the trial court improperly eliminated Leary Way sale proceeds owed to him. And he got "nothing more" from the Tallman proceeds even though no one disputed he "was entitled to some interest in these properties." Br. of Lee Noble at 42.

Lee and Julianna agreed before trial that Ed would receive $1 million from the Tallman proceeds.[19] This agreement was effective without any ruling on Ed's entitlement to the funds. The court also denied Julianna's motion for an order to force Ed to disgorge Leary Way sale proceeds he already received. Julianna did not challenge this order. The court ruled that Ed's receipt of Leary Way and Tallman proceeds were "more than adequate compensation to Ed Noble for any claims he might have against the marital community." CP at 314. But the court reduced Lee's total award when it credited these proceeds to his community share.

Lee cites the well-settled rule that the trial court focuses on the parties' assets before it at trial. If the parties dispose of an asset before trial, the court lacks ability to

---

[17] We note the trial record shows almost no disagreement by Julianna's attorney and expert over the tracing evidence presented. And Julianna presented no rebuttal evidence to undermine Lee's tracing evidence.

[18] Ed and Lee contend the tracing evidence shows Tallman and Leary properties are separate property.

[19] Julianna acknowledged that Ed had interests in Tallman and Leary. Thus, the only issue before the court was how much more Ed was entitled to from the proceeds.

distribute it at trial. Lee cites In re Marriage of White, 105 Wn. App. 545, 549, 20 P.3d 481 (2001). In White, the trial court abused its discretion by awarding to the wife her separate property of $30,511, which had already been spent on acquiring community assets subsequently distributed during the dissolution proceedings. On appeal, the court explained that "if one or both parties disposed of an asset before trial, the court simply has no ability to distribute that asset at trial." White, 105 Wn. App. at 549. The court reasoned that as soon as the money was spent, it ceased to exist and lost whatever character it previously had. White, 105 Wn. App. at 552.

Julianna acknowledges this well-settled principle. She argues instead that the court's community property division accounted for Lee's misconduct and waste of assets when he gifted nearly $2 million to Ed before trial.

Julianna relies on Marriage of Wallace, 111 Wn. App. 697, 45 P.3d 1131 (2002).[20] Wallace involved a husband's attempt to quitclaim the family home and business to his father "in lieu of foreclosure" without notice to his wife in violation of RCW 26.16.030(3). Unlike here, the husband conceded on appeal to fraudulent conduct regarding property transfers to his father. Wallace also differs from this case because Wallace involved extensive instances of fraud and fiscal misconduct. We held "it is an abuse of discretion to allow a [community property award] when the allegations and evidence focus on debts and property that are not before the dissolution court . . ." In re Marriage of Kaseburg, 126 Wn. App. 546, 561, 108 P.3d 1278 (2005) (discussing Wallace).

---

[20] This case was discussed above for a different proposition.

Even if we assume misconduct occurred, the trial court erred by awarding sale proceeds from Leary Way and Tallman as part of Lee's share of the community property that were already distributed pretrial to Ed. These proceeds were no longer marital assets available for division at the dissolution trial. And the trial court did not determine that Ed wrongfully received the Tallman proceeds subject to the stipulation, finding only that "[t]his hefty sum of cash is found to be more than adequate compensation to Ed Noble for any claims he might have against the marital community." CP at 314. Even Julianna's expert agreed that Ed was entitled to some of the proceeds of the Tallman sale.[21]

A trial court has broad discretion when distributing property in a dissolution case. White, 105 Wn. App. at 549; RCW 26.09.080. "When exercising this broad discretion, a trial court focuses on the assets then before it—i.e., on the parties' assets at the time of trial." White, 105 Wn. App. at 549. But this broad discretion is abused if, as here, it is grounded on an improper basis.

Because the trial court improperly focused on the sale proceeds correctly distributed to Ed before trial, it lacked the ability to distribute these proceeds at trial as part of Lee's dissolution award.

---

[21] Ed's counsel cross-examined Julianna's expert witness:
[COUNSEL]: So it's fair to say, is it not, that Ed Noble's claim to a portion of the Tallman proceeds is a legitimate claim?
[BEATON]: I would agree with that.
RP (Oct. 3, 2013) at 742.

Ed's Standing in Tallman Lawsuit

Ed also contends that the trial court improperly "divested" him of his interest in half the Tallman proceeds by ruling that he lacked standing to sue Tallman to protect his interest. Br. of Ed Noble at 42.

The court's standing ruling is based on its finding that "the LLC is not yet winding up and creditors (the martial community) have not yet been paid." CP at 312. This ruling is erroneous for two reasons. First, the Tallman operating agreement granted members the right to interim distributions or allocations of the net profits as directed by the managing member. The agreement also allows:

> The managing members shall determine, from time to time in their reasonable judgment, to what extent the company may make distributions from excess. The distributions may be in cash or property.

Ex. 310.

Second, under former RCW 25.15.215 (1994), governing interim distributions, an LLC "member is entitled to receive from a limited liability company distributions before the member's disassociation from the limited liability company and before dissolution and winding up thereof." RCW 25.15.230, governing the right to distribution, also states that at the time a member is entitled to receive a distribution, he is entitled to all remedies available to a creditor of the LLC with respect to that distribution.[22]

Julianna fails to address the operating agreement and statutes applicable here. The trial court's standing ruling is erroneous.

---

[22] Former RCW 25.15.215 and .238 were amended in January 2016 after the dissolution decree was entered in this case.

Tallman LLC Tax Liability

Lee argues the trial court erred in its property division when it failed to consider the roughly $1.5 million tax liability on the Tallman sale. We decline to address this issue based on our resolution of the issues here. The trial court must address this issue on remand.

Promissory Note Lawsuit

Ed contends the trial court erred when it invalidated all the promissory notes Lee signed in his favor and dismissed his lawsuit.

The trial court determined the remaining notes were unenforceable after it resolved two promissory notes:

> The remainder of the promissory notes, 21 in number, spanning a time period from 2001 through 2012 and totaling $313,119.20, are found to be inauthentic and unenforceable. Lee and Ed Noble claim that Ed loaned Lee money from time to time because Lee was short of funds. The court finds this not credible, given their course of conduct and the fact that Lee Noble had been giving $3,000 a month to his father since 2005. The evidence showed that the vast majority of the notes represent amounts on checks written by Ed Noble to the LLC's, not to Lee Noble. One of the few personal loans to Lee Noble, $3,000 in cash loaned on 10/15/2004, was apparently repaid to Ed Noble two weeks later (Exhibit 274), yet it was still claimed to be owing. No credible alternative explanation was provided by Lee or Ed Noble to rebut the repayment.
>  . . . .
> The court finds overall that Ed Noble's lawsuit (13-2-05778-6 SEA) against Lee Noble on the promissory notes fails due to the lack of authenticity and/or enforceability of the alleged notes.

CP at 316 (emphasis added).

Ed argues "authenticity" is defined under Evidence Rule 901. He analyzes the rule's authentication requirement. A document is admissible if evidence shows it "is what its proponent claims." ER 901. He argues the notes satisfied this rule at trial.

-37-

Julianna argues Ed misconstrues the court's ruling. She argues "inauthentic" means the notes did not evidence genuine debt obligations. She also argues this conclusion is supported by substantial evidence. For example, Lee paid Ed $3,000 per month until just before trial. Neither Lee nor Ed listed the promissory notes on any of their financial statements.

The court's reference to "lack of authenticity," viewed in context, means it concluded the notes do not evidence genuine debts owned by Lee to Ed.[23]

Ed reargues the significance of the court's factual findings. He does not challenge the findings as insufficient. They are verities on appeal. The findings support the court's conclusion that the notes were not enforceable. The trial court properly dismissed Ed's promissory note lawsuit.

Carsten Promissory Note (Leary Way Property)

The trial court declined to enforce the $203,000 note between Ed and Lee on grounds it lacked consideration or foundation. The court entered the following findings regarding this note only:

> 1515 Leary Way, held under ownership of Carstens Building, LLC was sold on May 30, 2012, during the pendency of the dissolution, for $2,500,000. The Leary property secured a line of credit at Union Bank in the amount of $1,329,748, and that loan was paid off out of escrow. After closing costs, the net profit on the sale was $972,513. Per Lee Noble's instructions, the entire net proceeds were wired straight from escrow into Edwin Noble's account.
>
> Julianna Noble moved for an order to disgorge the $972,513 and have it placed in a protected account pending trial. An order was entered August 29, 2012 to place half the net proceeds in a blocked account pending trial; however, that decision was reversed on revision on September 25, 2012. Lee Noble's argument upon revision was that, because the loan secured by the Leary property was paid off with sale

---

[23] No one objected to the admission of the notes on lack of authenticity grounds because the notes were admitted at trial. The ER 901 challenge fails.

proceeds and because the loan payoff benefitted an LLC solely owned by Lee Noble, in order for his father to receive 50% of the Leary profits, he had to give his father all the cash plus a promissory note for $203,000. Neither Lee nor Ed Noble provided a balance sheet or equity account record to show the capital accounts of Lee or Ed Noble in Carstens Building, LLC or to show any loans between Cartsens and any other LLC.

As with all the LLC's, father and son ignored the statutes and the LLC's own foundational requirements to keep capital accounts and balance sheets. Since Lee and Ed Noble produced no documentation of a binding agreement they might have had regarding the debt secured by the Leary property, there is no basis to find the debt is anything other than a debt of Carstens Building, LLC to be shared equally by the members. The 2011 Carstens Building, LLC tax return (Exhibit 251) contains a capital account reconciliation schedule showing Ed Noble with a negative $105,060 balance and Lee Noble with a positive $49,818 balance. The court finds no basis to support Ed Noble's right to the net proceeds of the Leary sale.

. . . .

The promissory note for $203,376.40, dated May 30, 2012 is found to be unenforceable for lack of consideration or foundation. Lee Noble claims this amount is due to his father as part of his 50% share of the net proceeds of the Carstens/Leary closing on May 30, 2012. However, as discussed above, no reliable evidence was provided to show that Ed Noble has a right to 50% of the net proceeds from the Leary sale, of which he already received $972,000.

CP at 312-15.

Ed does not challenge the findings of fact based on insufficient evidence. The findings are thus verities on appeal. These findings support the trial court's conclusion that the note is not enforceable. This claim fails.

Shannon Finding

Lee argues a "Shannon finding"[24] is insufficient to avoid remand based on the court's legal errors. Br. of Lee Noble at 45.

---

[24] In re Marriage of Shannon, 55 Wn. App. 137, 142, 777 P.2d 8 (1989) ("Remand is required where (1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way."). The parties refer to this legal principle as a "Shannon finding."

-39-

The trial court's finding states: "if the LLCs and properties in which Lee Noble held an interest had been found to be separate property, it would be equitable to divide the property in the same proportion." CP at 322.

Generally, the failure to properly characterize the divisible property may constitute reversible error. In re Marriage of Olivares, 69 Wn. App. 324, 330, 848 P.2d 1281 (1993). Remand is thus required when it appears the trial court's division of the property was driven by a mischaracterization of the separate or community nature of the property. In re Marriage of Shannon, 55 Wn. App. 137, 141, 777 P.2d 8 (1989); Marriage of Skarbek, 100 Wn. App. 444, 450, 997 P.2d 447 (2000).

Julianna argues a Shannon finding is adequate because the ultimate question in any marital dissolution is whether the property division is fair, just, and equitable under the circumstances. Kraft, 119 Wn.2d at 449. Julianna also claims that even if the court mischaracterized some of the property, this court should affirm the division of certain other (unidentified) property.

The fundamental legal errors here undermine a fair, just, and equitable property division. The trial court did not have in mind the correct character of the properties as community or separate prior to ordering its division. The court mainly relied on untenable legal grounds and ignored the tracing evidence when it ordered the division of property. It is questionable whether the trial court would impose the same property division if it had properly characterized the disputed property and applied correct legal principles to resolve this complex dissolution proceeding.

<u>Attorney Fees Award</u>

Lee challenges the trial court's $150,000 attorney fees award to Julianna on grounds that the findings are inadequate. Because we remand the entire property division here, we also reverse the court's attorney fees award. The trial court may consider whether to award attorney fees upon conclusion of the case. We also decline to award attorney fees in this appeal.

<u>CONCLUSION</u>[25, 26]

The trial court's adjudication of Ed's property interest was erroneous. The trial court's reliance on untenable legal theories to distribute Ed's property interests and to characterize most of the disputed properties as community was erroneous. The court compounded these errors by not addressing the tracing issue. Lee presented numerous documents to support his tracing methodology as Julianna's expert acknowledged above. The trial court failed to recognize that tracing properties acquired during marriage to a separate or community source was essential to properly characterize the properties as separate or community.

For the reasons discussed above, we reverse the trial court's order distributing the parties' assets and remand for redistribution consistent with this opinion. We affirm the trial court's order dismissing Ed's promissory note lawsuit. We reverse the order

---

[25] Julianna's attorney filed two motions after oral argument: "Motion to Enforce RAP 12.1(a) by declining to consider an issue raised by appellant Lee Noble for the first time at oral argument," and "motion to supplement its statement of facts to address an issue raised by the court at oral argument." We deny both motions. In light of our disposition here, we need not address the matters raised by these motions.

[26] Julianna's attorney filed two statements of additional authority citing <u>Rea v. Rea</u>, 19 Wn. App. 496, 576 P.2d 84 (1978); <u>Blair v. McKinnon</u>, 40 Wn.2d 492, 244 P.2d 250; <u>In re Marriage of Schwarz</u>, 192 Wn. App. 180, __ P.3d __ (2016). Given our resolution of the issues, we do not find these cases persuasive.

dismissing the Tallman lawsuit and remand for further proceedings. We reverse the order granting attorney fees to Julianna, remand for further proceedings, and deny attorney fees on appeal.

WE CONCUR: